1   Shawn Steel, Esq. (SBN: 80706)*
    ShawnSteel@shawnsteel.com
2   Alexander C. Eisner, Esq. (SBN: 298968)
    AlexanderEisner@shawnsteel.com
3   SHAWN STEEL LAW FIRM
4   3010 Old Ranch PKWY, Suite 260
    Seal Beach, CA 90740
5   Telephone: (949) 551-9000
    Fax: (949) 612-9797
6   (Lead Attorneys on Tort Claims)

7
    *Pro hac vice application pending
8
9   William J. Becker, Jr., Esq. (SBN: 134545)
    FREEDOM X
10  11500 Olympic Blvd., Suite 400
    Los Angeles, CA 90064
11  Telephone: (310) 636-1018
    Fax: (310) 765-6328
12  Bill@FreedomXLaw.com
    (Lead Attorney on Constitutional Claims)
13

14
                **UNITED STATES DISTRICT COURT**
15         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                       **OAKLAND DIVISION**
16

17  **JOHN JENNINGS**, an individual; **KATRINA**        Case No. 4:18-cv-0268
    **REDELSHEIMER**, an individual; **TREVER**
18  **HATCH**, an individual; and **DONALD**              1.  Violation of the Fourteenth Amendment
    **FLETCHER**, an individual;                              (42 U.S.C. § 1983)
19                                                        2.  Violation of the Fourteenth Amendment
                                                              (42 U.S.C. § 1983 - Monell)
20                 Plaintiffs,                            3.  Violation of Ralph Act
                                                              (Cal. Civ. Code 51.7 & 52)
21                    vs.                                 4.  Violation of Bane Act
                                                              (Cal. Civ. Code §§ 52 & 52.1)
22  **THE REGENTS OF THE UNIVERSITY OF**                 5.  Civil Battery and Conspiracy
    **CALIFORNIA**; **JANET NAPOLITANO**, in             6.  Negligence
23  her official capacity as President of the            7.  Premises Liability; Negligence
    University of California; **NICHOLAS B.**             8.  Intentional Infliction of Emotional Distress
24  **DIRKS**, individually as former Chancellor of      9.  False Imprisonment
    University of California, Berkeley; **CAROL T.**
25  **CHRIST**, individually and in her official
    capacity as Chancellor of University of              **DEMAND FOR JURY TRIAL**
26  California, Berkeley; **STEPHEN C. SUTTON**,
    individually and in his official capacity as
27  Interim Vice Chancellor of the Student Affairs
28

---

Complaint                                                                    Case No. 4:18-cv-0268

FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

Division of University of California, Berkeley; **JOSEPH D. GREENWELL**, individually and in his official capacity as Associate Vice Chancellor and Dean of Students of University of California, Berkeley; **MARGO BENNETT**, individually and in her official capacity as Chief of Police of University of California Police Department, at Berkeley; **ALEX YAO**, individually and in his official capacity as Operations Division Captain of University of California Police Department, at Berkeley; **LEROY M. HARRIS**, individually and in his official capacity as Patrol Lieutenant of University of California Police Department, at Berkeley; **IAN DABNEY MILLER**, an individual, **RAHA MIRABDAL, a.k.a. SHADI BANOO**, an individual; **CITY OF BERKELEY**, a municipal corporation (Berkeley California); **CITY OF BERKELEY POLICE DEPARTMENT**, a municipal subdivision (Berkeley California); **ANDREW R. GREENWOOD**, individually and in his official capacity as Interim Chief of Police of the City of Berkeley (Berkeley California); **CITY OF BERKELEY DOES** 1-50; **UNIVERSITY OF CALIFORNIA, BERKELEY DOES** 51-100; and **RIOT DOES** 101-150.

Defendants.

Plaintiffs John  Jennings, Katrina Redelsheimer, Trever Hatch and Donald Fletcher (collectively "Plaintiffs") bring this action against Defendants The Regents Of The University Of California, Janet Napolitano, in her official capacity as President of the University of California; Nicholas B. Dirks, individually as former Chancellor of University of California, Berkeley; Carol T. Christ,[1] individually and in her official capacity as Chancellor of University of California, Berkeley;  Stephen C. Sutton, individually and in his official capacity as Interim Vice Chancellor of the Student Affairs Division of

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), on or around June 1, 2017, UC Berkeley Chancellor Carol T. Christ was automatically substituted as Defendant to all official capacity claims previously asserted against former UC Berkeley Chancellor Nicholas B. Dirks. Plaintiffs also assert individual capacity claims against both Christ and Dirks.

University of California, Berkeley; Joseph D. Greenwell, individually and in his official capacity as Associate Vice Chancellor and Dean of Students of University of California, Berkeley; Margo Bennett, in her official capacity as Chief of Police of University of California Police Department, at Berkeley; Alex Yao, individually and in his official capacity as Operations Division Captain of University of California Police Department, at Berkeley; Leroy M. Harris, individually and in his official capacity as Patrol Lieutenant of University of California Police Department, at Berkeley (collectively "UC Berkeley Defendants") for compensatory, punitive, equitable and injunctive relief following the many violations of constitutional and statutory rights of the Plaintiffs as they visited the University of California, Berkeley, campus the evening of February 1, 2017, to attend the scheduled personal appearance of Milo Yiannopolous.

Plaintiffs also bring this action against the City of Berkeley, a municipal corporation (Berkeley, California); City of Berkeley Police Department, a municipal subdivision (Berkeley, California); and Andrew R. Greenwood, individually and in his official capacity as Interim Chief of Police of the City of Berkeley (Berkeley, California) (collectively "City Defendants"), for compensatory, punitive, equitable and injunctive relief following the many violations of constitutional and statutory rights of the Plaintiffs as they visited the University of California, Berkeley, campus the evening of February 1, 2017, to attend the scheduled personal appearance of Milo Yiannopolous.

Plaintiffs also bring individual claims against their attackers, including Ian Dabney Miller, an individual, and Raha Mirabdal, an individual ("Batterer Defendants").

## INTRODUCTION

1.     This action seeks to protect and vindicate fundamental rights. It is a civil rights action brought under the Fourteenth Amendment against government actors responsible for creating dangerous conditions and exposing the Plaintiffs to physical harm caused by a violent mob of anarchists at a student-sponsored Milo Yiannopolous event ("Yiannopolous event") scheduled to take place at the University of California, Berkeley ("UC Berkeley" and "University") on February 1, 2017. Government actors took affirmative measures in preparation for and in response to the riotous mob that left the Plaintiffs in a situation more dangerous than the one in which they found the Plaintiffs.

2.     Government actors are responsible for creating and exposing the Plaintiffs to the unlawful actions of an angry mob of violent anarchists by directing law enforcement officers to vacate locations in and around Sproul Plaza and the MLK Center at UC Berkeley, agitating the mob by issuing feckless disbursal orders and empty threats of arrest from a vantage point where they could

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

3

ensure their own safety while leaving Plaintiffs exposed to violent assaults, erecting barricades in such a manner as to enable angry malefactors to surround Plaintiffs and assault them and to deprive Plaintiffs of an exit route, failing to enforce the law and by other affirmative actions. By their failure to intervene or employ reasonable tactical methods to ensure the safety of the Plaintiffs and the public, government actors conducted their official duties with deliberate indifference to the Plaintiffs' safety, permitting hordes of violent rioters to swarm the university campus in a violent rage. By their failure, government actors are thus responsible for creating and exposing Plaintiffs to known and obvious danger.

3.   This action additionally seeks relief from government actors who failed to exercise their duty of care to plan effectively for the foreseeable harms brought upon the Plaintiffs and from the perpetrators of unlawful assaults.

## JURISDICTION AND VENUE

4.   This action arises under 42 U.S.C. § 1983 in relation to the City Defendants' deprivation of the Plaintiffs' constitutional rights. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331, 1343, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the related state claims.

5.   Venue is proper in this judicial district under 28 U.S.C. § 1391, because a substantial part of the acts or omissions giving rise to the claims for relief occurred in or were directed toward this District, and each of the Defendants is subject to the personal jurisdiction of this Court. This Court has personal jurisdiction over each of the Defendants, because each of the Defendants is domiciled in the State of California, has sufficient minimum contacts with California, and/or otherwise has intentionally availed himself or herself of significant benefits provided by the State of California, rendering the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

6.   This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(3); the requested damages under 28 U.S.C. § 1343(3); and attorneys' fees and costs under 42 U.S.C. § 1988.

## INTRADISTRICT ASSIGNMENT

7.   This action is properly assigned to the Oakland Division of the Court, as the conduct giving rise to this dispute occurred in Alameda County, California.

/ / /

Complaint                                                           Case No. 4:18-cv-0268

## PARTIES

### Plaintiffs

8.      Plaintiff John Jennings ("Jennings") is an individual who, at all times relevant to the Complaint, was domiciled in San Francisco, California.

9.      Plaintiff Katrina Redelsheimer ("Redelsheimer") is an individual who, at all times relevant to the Complaint, was domiciled in San Francisco, California.

10.      Plaintiff Trever Hatch ("Hatch") is an individual who, at all times relevant to the Complaint, was domiciled in San Francisco, California.

11.      Plaintiff Donald Fletcher ("Fletcher") is an individual who, at all times relevant to the Complaint, was domiciled in Oakland, California.

### UC Berkeley Defendants

12.       Defendant The Regents of the University of California ("Regents") is a corporation constituted for the public trust and established by the California Constitution (Article IX, Sec. 9) with the power to sue and to be sued.

13.      Defendant Janet Napolitano ("Napolitano") is the President of the University of California. According to Regents Standing Order 100, "[t]he President shall be the executive head of the University and shall have full authority and responsibility over the administration of all affairs and operations of the University" Napolitano ultimately is responsible for all policies enacted and enforced at UC Berkeley, including the policies challenged herein. She acted under color of state law, and is sued in her official capacity.

14.      Prior to June 1, 2017, Defendant Nicholas B. Dirks ("Dirks") was the Chancellor of UC Berkeley and was UC Berkeley's chief executive officer, responsible for UC Berkeley's administration and policy-making, and had ultimate authority to approve the unwritten policies and procedures challenged herein that were applied to deprive Plaintiffs of their constitutional rights.

15.      On or around June 1, 2017, Defendant Carol T. Christ ("Christ") replaced Dirks as Chancellor of UC Berkeley, and pursuant to Federal Rule of Civil Procedure 25(d) was automatically substituted as defendant in connection with all official capacity claims asserted against Dirks. Accordingly, Plaintiffs assert claims against Dirks in his individual capacity only. Dirks acted under color of state law.

16.      On or around June 1, 2017, prior to the February 1, 2017, event featuring Milo Yiannopolous discussed below, Defendant Christ became Chancellor of UC Berkeley, and as such, is

FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

5

UC Berkeley's chief executive officer, responsible for UC Berkeley's administration and policy-making, and has ultimate authority to approve the policies and procedures challenged herein that were and will be applied to deprive Plaintiffs of their constitutional rights. Christ acted under color of state law, and is sued in her individual and official capacities.

17.     Defendant Stephen C. Sutton ("Sutton") is the Interim Vice Chancellor of the Student Affairs Division, at UC Berkeley. SUTTON acted under color of state law, and is sued in his official and personal capacities.

18.     Defendant Joseph D. Greenwell ("Greenwell") is the Associate Vice Chancellor for Student Affairs and the Dean of Students, at UC Berkeley. GREENWELL acted under color of state law, and is sued in his official and personal capacities.

19.     Defendant Margo Bennett ("Bennett") is the Chief of Police for the UCPD, at the UC Berkeley campus. Bennett acts as the ultimate authority for the UCPD at the UC Berkeley campus and is responsible for UCPD's administration and policy-making, and has ultimate authority to approve the policies and procedures challenged herein that were applied to deprive Plaintiffs of their constitutional rights. BENNETT acted under color of state law, and is sued in her official capacity.

20.     Defendant Alex Yao ("Yao") is the Operations Division Captain for the UCPD, at the UC Berkeley campus. YAO acted under color of state law, and is sued in his official and personal capacities.

21.     Defendant LeRoy M. Harris ("Harris") is the Patrol Lieutenant for the UCPD, at the UC Berkeley campus. Harris acted under color of state law, and is sued in his official and personal capacities.

### City Defendants

22.     Defendant City of Berkeley ("City of Berkeley") is a municipal entity duly organized and existing under the laws of the State of California. It is a municipal corporation with the power to sue and be sued.

23.     Defendant City Of Berkeley Police Department ("BPD") is a municipal entity duly organized and existing under the laws of the State of California. It is a municipal corporation with the power to sue and be sued.

24.     Defendant Andrew R. Greenwood ("Greenwood") is the interim police chief of the City of Berkeley Police Department. Greenwood acted under color of state law, and is sued in his official and personal capacities.

/ / /

Complaint                                                                 Case No. 4:18-cv-0268

FREEDOM X
11590 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Batterer Defendants**

25.    Defendant Ian Dabney Miller ("Miller") is an individual, who at all times relevant to the allegations of the Complaint, was an employee of the University of California, Berkeley, who protested the Yiannopolous event. On information and belief, Defendant Miller is a member of the radical, American militant, left wing, political group BAMN (By Any Means Necessary). Defendant MILLER is being sued in his individual capacity and in his official capacity, where applicable.

26.    Defendant Raha Mirabdal, a.k.a. Shadi Banoo ("Mirabdal") is an individual and a former employee of the University of California, Davis, who protested the Yiannopolous event. On information and belief, Defendant MIRABDAL is a member of the radical, American militant, left wing, political group BAMN (By Any Means Necessary). Defendant Mirabdal is being sued in her individual capacity.

**DOE Defendants**

27.    Plaintiffs are unaware of the true names and/or capacities of defendants sued herein as City of Berkeley DOES 1-50 ("City DOES"); University of California, Berkeley DOES 51-100 ("UC Berkeley DOES"); and Riot DOES 101-150 ("Riot DOES") and therefore sue said defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiffs believe and allege that each of the DOE defendants is legally responsible and liable for the incident, injuries, and damages set forth in this Complaint. Each defendant proximately caused injuries and damages because of their active participation in the subject incident, and/or because of their negligence, breach of duty, negligent supervision, management or control, violation of public policy, or tortious conduct. Each defendant is liable for his/her personal conduct, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, ownership, entrustment, custody, care or control or upon any other act or omission. Plaintiffs will ask leave to amend this Complaint subject to further discovery and investigation.

**STATEMENT OF COMPLIANCE WITH GOVERNMENT TORT CLAIMS ACT**

28.    In order to comply with all applicable administrative claim requirements under California law, Plaintiffs have filed, on behalf of themselves, claims to the proper City and university entities duly charged with processing such claims.

**FACTUAL BACKGROUND**

29.    The City of Berkeley and UC Berkeley are historically and notoriously recognized as host centers for civil unrest. The civil rights, free speech, sexual liberation and anti-war movements of the 1960s and 1970s cemented the reputations of the city and the university as the nation's loci of

7

politically left-wing student activism. Over the ensuing decades, City of Berkeley and UC Berkeley law enforcement officials have perfected techniques, tactics and procedures for managing civil unrest and have established crowd management policies outlining their protocols.[2]

### The UCPD Crowd Management Policy

30.    The "Crowd Management Policy" ("CMP")  sets forth guidelines for handling public disturbances, including "civil disorders," defined as "unlawful event[s] involving significant disruption of the public order." The CMP's purpose is "to provide an outline of basic steps to be taken and/or considered by UCPD in the management of campus demonstrations." UCPD has recognized for more than a decade that "[d]emonstrations may develop spontaneously or be pre-planned long in advance. They may also be very brief or last for days. Demonstrations may develop from peaceful campus events or be *specifically planned to be disruptive*. Police response and overall management are most effective when there is *advance planning and communication*." (Emphasis added.) "Demonstration," as defined by the CMP, "includes a broad range of gatherings. Generally they are events with a significant crowd intending to express a particular point of view to others, often 'The University', and *often through highly visible and possibly disruptive means*. They are distinguished from peaceful meetings but may spring from them." (Emphasis added.)

31.    The CMP specifically states that it is "[t]he responsibility of UCPD [] to protect the lives, property and rights of all people and to enforce the law. Personal safety is of primary importance for participants, non-participants and those who must be present by virtue of their positions (including Police Officers). Security of University facilities and continuation of normal business are also priorities."

32.    The CMP has for decades recognized the potential for violence to erupt at demonstrations and the UCPD's duty to keep the peace and maintain public order: "UCPD recognizes that

---

[2] A true and correct copy of the University of California Police Department, Berkeley "Crowd Management Policy," December 15, 2000, is attached hereto as Exh. 1 and incorporated herein by reference (https://vca.berkeley.edu/sites/default/files/PRBCrowdPolicy.pdf).; A true and correct copy of "Crowd Management And Civil Disobedience Guidelines," March 2003, California Commission on Peace Officer Standards and Training, is attached hereto as Exh. 2 and incorporated herein by reference (https://info.publicintelligence.net/CA-CrowdManagement.pdf).; A true and correct copy of "POST Guidelines Crowd Management, Intervention, and Control," 2012, California Commission on Peace Officer Standards and Training, is attached hereto as Exh. 3 and incorporated herein by reference (http://lib.post.ca.gov/Publications/CrowdMgtGuidelines.pdf). Plaintiffs will seek leave to amend the Complaint to allege more current policy language following discovery.

Complaint                                                                 Case No. 4:18-cv-0268

demonstrations and crowd situations are often very fluid and continually evolving and that each one is unique. ***They may also be volatile and there is always the potential for them to degenerate with the possibility of violence, law/rule violations and property damage. In such an event the command officers on scene shall take whatever action is reasonable to maintain order and peace, including application of crowd control techniques***."[3] (Emphasis added.)

33.     The CMP sets forth the following relevant procedures:

Crowd management situations can be divided into various categories, including: "Lawful" or "Unlawful" and "Planned Events" or "Spontaneous Events". These include many different kinds of events such as rallies, marches/parades, sports events, labor disputes, parties/social gatherings, disasters, entertainment events, political events, or community celebrations. ***These events at times evolve into demonstrations/protests, sit-ins, and other forms of civil disobedience up to and including riots. It is incumbent upon the police department, in coordination with other appropriate campus units, to manage these events in order to reduce the chances that they will turn into unlawful or riotous situations, to ensure the safety of University affiliates and visitors to the campus, and to ensure the University continues to accomplish it's [sic] mission***. The department should take basic steps in managing these situations by attempting to do the following;

> 1) Establish communication/liaison with the involved group(s),
> 2) Work with the involved group(s) and other appropriate departments to manage the event and prevent, resolve and defuse unlawful and disruptive acts,
> 3) Establish a command structure to manage the event,
> 4) ***Make an initial assessment and continually assess the situation***,
> 5) ***Use UCPD approved crowd control tactics when necessary to disperse or arrest individuals who are committing unlawful acts against the public, the University, or the police***, and
> 6) Conduct post-event management review and debriefings.

34.     The CMP further details the process of pre-event management and planning as follows in relevant part:

Ideally there will be sufficient time and cooperation such that there can be thorough and effective preplanning for significant crowd events. ***Pre-event management includes strategies that can be employed … to prevent a lawful event from deteriorating into an unlawful event***. The Department recognizes that in spontaneous events there is little advance notice to allow for pre-event management strategies to be employed. It is also recognized that some pre-event management strategies can only be employed with the cooperation of the event organizers and involved stakeholders. Pre-event management strategies are most successful when used for a planned event. However, an attempt should be made to employ as many of the suggested strategies as possible whether the situation is a planned event or spontaneous event.

---

[3] *Id.*

FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

* * *

Planned events more often allow the Police Department to use pre-event management strategies. Regardless of the potential for a large gathering to become unruly or unlawful it is in the interest of the Police Department and the University to work with the event organizers and other identified stakeholders in planning and monitoring the event. The department should appoint a liaison officer who should do the following:

- Identify, make contact and attempt to develop a rapport with the organizers of the proposed event.
- Identify any and all stakeholders.
- Determine intentions and motivations of the group, organizers, and identified leadership.
- Facilitate meetings with the organizers/leadership and stakeholders to discuss time, place, and manner issues.
- Clearly state what activities are and are not permitted.
- Notify the University Observer Program, as appropriate, to be present at the event.
- Notify the Office of Student Life, as appropriate, to be present at the event.
- Encourage the group to utilize a method of "self monitoring".
- Identify the actual contact person for the group during the event and identify back up contacts.
- ***When there is reason to believe that there will be civil disobedience, contact the District Attorney's Office to notify them of the potential for civil disobedience and identify appropriate criminal charges and what is needed for successful prosecution.***
- ***Preview the scene of the event, if known, to consider such things as access routes, staging areas, communication issues, possible weapons and containment issues.***
- Arrange for resources, including support personnel, equipment and logistics. This includes resources such as off-duty or specialty unit personnel, Mutual Aid, Physical Plant & Campus Services, the Fire Department, and identify equipment needs such as barricades, vehicles, bullhorns, video, bolt cutters, fire extinguishers to be available, as appropriate, for the event.
- ***Notify/liaison with Berkeley PD regarding possible effects in their jurisdiction and coordination***.

* * *

- Brief the command staff on all obtained information.

(Emphasis added.)

35.    The CMP additionally details the scope of police action and deadly force that may become necessary:

While it is highly desirable to avoid situations that require physical police intervention, it is recognized that they will occur. ***A variety of techniques and tactics may be necessary to resolve a civil disobedience or crowd control incident.*** The tactics utilized in a particular situation will depend upon available resources and the situation itself. The decisions to use force and the force options that may be applied in response to these incidents range from law enforcement presence

10

Complaint                                                          Case No. 4:18-cv-0268

to deadly force. Peace officers need not use the least intrusive force option, but only that force which is reasonable under the totality of the circumstances. UCPD utilizes pain compliance techniques to elicit a compliant response if necessary when making arrests.

***The application of nonlethal chemical agents, including Oleoresin Capsicum (OC), has proven effective in a wide variety of civil disobedience situations***. This department utilizes OC as a defensive and offensive weapon. The standard hand-held canister is not normally intended to be used by officers to disperse a crowd but it may if necessary. Generally OC should only be used at the direction of a supervisor in a crowd control situation. Immediate use may be appropriate for self defense in the event of a personal attack or breach of the line or other exigent circumstances.

"Less lethal" force options such as Chemical Agents, Flexible Baton rounds, and other impact weapons may be deployed to disperse a crowd at the discretion of the Overall Commander. The deployment of such Less Lethal options shall be in accordance with the Department's written policies (refer GO-F6).

The use of Chemical Agents, smoke, or other Less Lethal devices to disperse a crowd shall be coordinated and controlled. The Overall Commander shall ensure a clear path is available for these who wish to leave the area prior to and during the deployment of Less Lethal devices. At such time that it is deemed appropriate to take police action, such as moving a crowd or making arrests at a sit-in, consideration should be given to communicating the intended action to the crowd in advance.

While giving such advance notice is often desirable, tactical concerns may preclude it. Police personnel should make such an announcement if it is made. If possible, the Field Commander should ensure that the area where the unlawful assembly exists is contained prior to reading the dispersal orders so that additional people do not enter the area.

(Emphasis added.)

36.     The CMP additionally sets forth dispersal orders and procedures for mass arrests. In addition to the guidelines provided in the CMP, the CMP directs commanders to the "Crowd Management and Civil Disobedience Guidelines by the Commission on Peace Officer Standards and Training."

**The City Defendants, City DOES, UC Berkeley Defendants and UC Berkeley DOES Had Prior Knowledge Of Other Violent Campus Demonstrations Targeting Milo Yiannopolous And His Supporters**

37.     In 2016 and 2017, Milo Yiannopolous ("Yiannopolous") grew in fame and notoriety as a celebrated but controversial political commentator. Yiannopolous' entertaining style of punditry can best be described as voluble, articulate, profane, glib, blunt, unapologetic and provocative. To many, Yiannopolous' openly gay sexual orientation strikes a puzzling counterpoint juxtaposed against his

SHAWN STEEL LAW FIRM
FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

11

conservative/libertarian political outlook. To his left wing detractors, he is considered threatening, offensive and polarizing.

38. In 2016, Yiannopolous launched a speaking tour of college campuses provocatively christened the "Dangerous Faggot Tour." City and UC Berkeley Defendants, and each of them, should have expected and been fully prepared for violent demonstrations to break out at the Yiannopoulos event for multiple reasons. As alleged herein, among other reasons, City and UC Berkeley Defendants possessed knowledge of (1) prior violent protests and demonstrations targeting and disrupting Yiannopolous' campus appearances at the University of California, Davis, DePaul University and the University of Washington; (2) anti-Trump protests and demonstrations that had been taking place around the country for more than a year; (3) letters and emails protesting the Yiannopolous event the university was receiving; (4) social media announcements of planned protests and demonstrations; (5) the long history of violent demonstrations at UC Berkeley and within the City of Berkeley; (6) law enforcement lessons learned from prior demonstrations; and (6) press reports.

39. City and UC Berkeley Defendants, and each of them, possessed prior knowledge of earlier violent incidents on college campuses where Yiannopolous had been invited to speak during his speaking tour. In May 2016, Yiannopoulos' speech was shut down at DePaul University when student protesters stormed the stage, took over his microphone and committed a number of assaults on people attending the event.[4] Two weeks before the UC Berkeley riot, a man was shot outside a University of Washington hall prior to another planned Yiannopoulos speaking engagement.[5] As was true at the UC Berkeley event, masked protestors in Washington threw bricks at police and were armed with weapons, which they used to assault members of the crowd.[6] Another planned speaking engagement by

---

[4] Jessica Chasmar, "Milo Yiannopoulos banned from DePaul University for creating 'hostile environment' during May speech," *Washington Times*, July 27, 2016, https://www.washingtontimes.com/news/2016/jul/7/milo-yiannopoulos-banned-from-depaul-university-fo/; Blake Neff, "VIDEO: DePaul University Descends into Chaos over Milo Yiannopoulos Visit," *Daily Caller*, May 24, 2016, http://dailycaller.com/2016/05/24/video-depaul-university-descends-into-chaos-over-milo-yiannopoulos-visit/; Greer, Scott. *No Campus for White Men: The Transformation of Higher Education into Hateful Indoctrination* (Kindle Locations 600-602). ("Protesters charged the stage, commandeered the microphones, and threatened Yiannopoulos for the crime of voicing a right-wing point of view. Outside the event, demonstrators assaulted a few attendees and even some unaware passersby.")
[5] Rick Anderson, *Man shot before Breitbart editor Milo Yiannopoulos' speaking event is in critical condition*, Los Angeles Times, January 21, 2017, available at: http://www.latimes.com/nation/la-na-yiannopoulos-shooting-20170121-story.html.
[6] *Id.*

Complaint                                                                     Case No. 4:18-cv-0268

Yiannopoulos at UC Berkeley's sister school, UC Davis, was cancelled after school groups and university police determined that it was unsafe to continue the event amidst the chaotic protests that broke out.[7]

40.     City and UC Berkeley Defendants knew for weeks that Yiannopoulos' appearance could prompt violent protests that would threaten the school's long tradition of facilitating free speech. City and UC Berkeley Defendants should have reasonably anticipated a violent response to Yiannopoulos' presence on their campus and developed, in accordance with the CMP, tactical procedures sufficient to safeguard ticket purchasers attending the event.[8] The school's inaction was motivated by the fact that Yiannopoulos and his supporters have opposing viewpoints to the majority of the school's students and administration. Defendant Dirks, the former chancellor of UC Berkeley, has called Yiannopoulos "a troll and provocateur who uses odious behavior in part to 'entertain,' but also to deflect any serious engagement with ideas."[9]

41.     Furthermore, given the current political climate in the United States, the City and UC Berkeley Defendants, and each of them, should have foreseen that the protest of a controversial political figure such as Yiannopoulos could likely turn violent. Since the 2016 presidential election, there have been several highly publicized incidents where President Trump supporters have been the target of assault by violent protestors, including such violent assaults in the Bay Area.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[7] Ben Poston and Shelby Grad, "UC protests shut down Milo Yiannopoulos talk, sparking free speech debate," *Los Angeles Times*, January 15, 2017, accessible at: http://www.latimes.com/local/lanow/la-me-milo-yiannopoulos-uc-davis-20170115-story.html.

[8] Plaintiffs' attorneys herein successfully consulted with Cal State Fullerton campus administrators in October 2017 to develop security protocols to prevent violent demonstrations from occurring during Yiannopolous' appearance there on October 31, 2017. Benjamin Oreskes, "Milo Yiannopoulos' crusade fizzles in California, so he heads to Australia," Los Angeles Angeles Times, December 1, 2017, http://beta.latimes.com/local/lanow/la-me-milo-events-speakers-20171201-story.html.

[9] Patrick May, "UC Berkeley riot raises questions about free speech," *The Mercury News*, February 2, 2017, accessible at:
http://www.mercurynews.com/2017/02/02/uc-berkeley-riot-raise-questions-about-free-speech/.

13

FREEDOM X
11550 OLYMPIC BLVD, SUITE #00
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

**Radical Anarchist Groups Prepared to Riot at the Yiannopolous Event**

42.     On information and belief, in the time leading up to and including the day of the Yiannopolous Event, Batterer Defendants and Riot DOE defendants were making plans to assemble at Sproul Plaza for the purpose of engaging in a violent demonstration.

43.     Various anarchist groups, some organized and some decentralized, had openly announced their hatred and hostility toward President Trump and Yiannopolous. These groups included, but are not limited to, Berkeley Antifa,[10] IGD (It's Going Down)[11] BAMN (By Any Means Necessary) and Refuse Fascism.

44.     BAMN is an American left-wing militant group that organizes protests and litigation to achieve its aims.[12] BAMN has a history of arranging violent protests, which have been classified as "low-level terrorism" by the Department of Defense.[13] For example, in 2016, BAMN led a protest in Sacramento that resulted in ten people being hospitalized with stab wounds. Police and video taken at the event confirmed that BAMN members initiated the violence.[14]

45.     Refuse Fascism is a radical American, left-wing, anti-Trump, non-profit organization that organizes demonstrations to achieve its political agenda.[15] Refuse Fascism helped organize the shutdown of the Milo Yiannopoulos event, calling for its members to use "righteous" violence against "fascist" Yiannopoulos.[16] After the UC Berkeley riot, Refuse Fascism commented on its website that it supported the violence that occurred, stating, "[f]or all these reasons what happened at UC Berkeley is

---

[10] Valarie Richardson, "11 arrested as Milo cuts short Berkeley speech costing $800K over antifa concerns," *Washington Times*, September 24, 2017, https://www.washingtontimes.com/news/2017/sep/24/milo-yiannopoulos-berkeley-speech-cut-short-over-a/.

[11] Lena Mercer, "Keep Far-Right Agitator Milo Yiannopoulos Out Of Seattle," December 5, 2016, https://itsgoingdown.org/keep-far-right-agitator-milo-yiannopoulos-seattle/.

[12] BAMN, Wikipedia, https://en.wikipedia.org/wiki/BAMN.

[13] James Osborne, "Pentagon Exam Calls Protests 'Low-Level Terrorism,' Angering Activists," *Fox News*, June 17, 2009, http://www.foxnews.com/story/2009/06/17/pentagon-exam-calls-protests-low-level-terrorism-angering-activists.html.

[14] Joseph Serna, "Neo-Nazis didn't start the violence at state Capitol, police say," *Los Angeles Times*, June 27 2016, http://beta.latimes.com/local/lanow/la-me-ln-neo-nazi-event-stabbings-capitol-20160627-snap-story.html.

[15] *Id.*

[16] Refuse Fascism, "Three Points on the Righteous Shut-Down of Fascist Milo Yiannopoulos at UC Berkeley," https://refusefascism.org/2017/02/02/three-points-on-the-righteous-shut-down-of-fascist-milo-yiannopoulos-at-uc-berkeley/.

---

14

part of the kind of broad, powerful and meaningful protest which needs to continue on an unprecedented scale to OUST this regime from power." (Emphasis in original.)[17]

46.    Both BAMN[18] and Refuse Fascism[19] have taken credit for orchestrating the riots that occurred during the Yiannopoulos event.[20] BAMN and Refuse Fascism members appeared at the protest to assault peaceful pro-President Trump/pro-Yiannopolous supporters and vandalize UC Berkeley and private property. In fact, in March 2017, one month after Plaintiffs were attacked, pro-Trump supporters organized in Civic Center Park in Berkeley to support peaceful free speech—particularly after the violent Milo Yiannopoulos protest. BAMN members arrived at the protest and instigated violent and hostile altercations, leading to several injuries and arrests.[21] Indeed, on information and belief, Defendant Ian Dabney Miller ("Miller"), Defendant Raha Mirabdal ("Mirabdal"), and one or more of the unknown assailants who assaulted Plaintiffs are members of BAMN. This will be confirmed in discovery.

### Planning for the Yiannopolous Event

47.    In September 2016, the UC Berkeley College Republicans, a UC Berkeley Registered Student Organization ("RSO"), began preparations for hosting a Yiannopolous event as part of Yiannopolous' speaking tour. Pieter Sittler ("Sittler"), a member of the group at that time, was tasked with organizing the event.  Consistent with the CMP, Sittler met in mid-January 2017 with Defendants Lt. Leroy Harris and Capt. Alex Yao of the UCPD to coordinate safety and security protocols. Sittler spoke to Yao on approximately six occasions and took separate lengthy meetings with them.

48.    Sittler informed Harris and Yao that Yiannopolous' management was concerned about crowd management and security issues as a result of what had occurred at UC Davis. Harris and Yao

---

[17] *Id.*

[18] Three Points on the Righteous Shut-Down of Fascist Milo Yiannopoulos at UC Berkeley, Refuse Fascism," February 2, 2017, https://refusefascism.org/2017/02/02/three-points-on-the-righteous-shut-down-of-fascist-milo-yiannopoulos-at-uc-berkeley/.

[19] Tom Ciccotta, "Berkeley Mayor Is Member of Antifa Facebook Group that Organized Riots," *Breitbart*, April 21, 2017, http://www.breitbart.com/tech/2017/04/21/berkeley-mayor-is-member-of-antifa-facebook-group-that-organized-riots/.

[20] Chuck Ross, "Look Who Funds The Group Behind The Call To Arms At Milo's Berkeley Event," *The Daily Caller*, February 3, 2017, available at: http://dailycaller.com/2017/02/03/look-who-funds-the-group-behind-the-call-to-arms-at-milos-berkeley-event/.

[21] Tracey Taylor, "Photos: Pro- and anti-Trump campaigners face off in Berkeley," Berkeleyside, March 4, 2017, http://www.berkeleyside.com/2017/03/04/photos-pro-anti-trump-campaigners-face-off-berkeley/.

Complaint                                                                 Case No. 4:18-cv-0268

represented to Sittler that they were aware of the incident and were in contact with UC Davis police officials. Harris and Yao stated they were monitoring social media and were aware that professional agitators were planning to be bussed in. Harris and Yao stated they planned to erect double-barricade lines that would be impenetrable and unmovable, along with providing a strong police presence consisting of at least 100 police officers. Sittler was additionally told by Harris and Yao that they intended to use flood lights.

49.     At a meeting held on January 20, 2017, Harris and Yao advised Sittler that there would be 70 to 80 police officers on hand to manage security. Harris and Yao further advised that two sets of barricades, more secure than those used at UC Davis, would be erected.[22] Harris and Yao additionally told Sittler that they would have a "number of contingency plans" in place, including closing down MLK Center with "no chance of infiltration."[23]

50.     As word got out the College Republicans were planning the Yiannopolous event, the media began to report on it. The media reports suggested that not only were UC Berkeley officials aware of the potential for unusually violent demonstrations but were preparing to respond to them with sufficient resources. On December 23, 2016, the San Jose Mercury News quoted UC Berkeley campus spokesman Dan Mogulof as stating, "We're getting letters that are saying, 'If the university doesn't do the right thing, we're going to take matters into our own hands.'"[24] Initially, twelve UC Berkeley professors signed a letter demanding the Yiannopolous event be canceled;[25] approximately 90 more professors signed the letter after it was publicized but before the event.[26] Defendant Yao was quoted as stating, "UCPD's primary goal is the safety of the attendees and the speaker…. (We are) basically coming up with a basic security detail to ensure safety of the event, regardless of who the speaker is."[27] Yao was further quoted stating that about 45 police officers would be assigned to handle crowd control

---

[22] *Id.*

[23] *Id.*

[24] Katy Murphey, "UC Berkeley braces for Breitbart provocateur Milo Yiannopoulos," The Mercury News, December 23, 2016, https://www.mercurynews.com/2016/12/23/uc-berkeley-braces-for-breitbart-provocateur-milo-yiannopoulos/.

[25] Gibson Chu, "UC Berkeley professors request cancellation of Milo Yiannopoulos talk." *The Daily Californian*, January 10, 2017, http://www.dailycal.org/2017/01/10/uc-berkeley-professors-request-cancellation-milo-yiannopoulos-talk/.

[26] Members of UC Berkeley Faculty, "Open letters calling for cancellation of Milo Yiannopoulos event," http://www.dailycal.org/2017/01/10/open-letter-calling-cancellation-milo-yiannopolous-event/.
[27] *Id.*

Complaint                                                                  Case No. 4:18-cv-0268

and protest demonstrations.[28] On February 1, 2017, the day of the event, the San Francisco Chronicle reported that "UC Berkeley police plan to call in plenty of backup — including officers from other UC campuses — to provide a show of force at Wednesday night's appearance of right-wing social media provocateur Milo Yiannopoulos at Cal's Pauley Ballroom."[29]

**The City and UC Berkeley Defendants Failed to Protect Plaintiffs from Foreseeable Harm**

51.   On February 1, 2017, Plaintiffs visited the UC Berkeley campus to attend the Yiannopolous event. Although members of the City and UC Berkeley Defendants expected violence to erupt based on (1) prior violent protests of Yiannopolous' campus appearances at the University of California, Davis, DePaul University and the University of Washington, (2) the anti-Trump protests that had been taking place around the country for more than a year, (3) letters and emails the university was receiving, (4) their monitoring of social media, (5) the long history of violent demonstrations at UC Berkeley and within the City of Berkeley and law enforcement lessons learned from those incidents, and (6) press reports, they failed to establish a security operational plan sufficient to respond to the foreseeable level of violence.

52.   At or around the time that Plaintiffs were attempting to enter to the Yiannopolous Event, they observed a mob of marauding demonstrators, described by media as "paramilitary-style protesters,"[30] arrayed in masks and black clothing to conceal their identities as they executed their planned blitz on the university and Trump/Yiannopolous supporters. The demonstrators entered Sproul Plaza from Bancroft Way carrying anarchist/communist flags and various weapons.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[28] *Id.*

[29] Matier & Ross, "UC cops will be ready for trouble at Milo Yiannopoulos visit," Chronicle, February 1, 2017, http://www.sfchronicle.com/bayarea/article/UC-cops-will-be-ready-for-trouble-at-Milo-10898376.php.

[30] *See* video at Lilian Kim and Laura Anthony, "Violent protests over Yiannopoulos event bring chaos to Berkeley," ABC, Channel 7, KGO-TV, February 1, 2017, http://abc7news.com/news/violent-protests-over-yiannopoulos-event-bring-chaos-to-berkeley/1732466/.

Complaint                                                                 Case No. 4:18-cv-0268

FREEDOM X
11560 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740



*Figure 1: Map of Area (© Google Maps)*

53.    The paramilitary-style protesters committed arson and other acts of vandalism, hurling explosives and bashing in windows at or around the northwest exterior of MLK Center.

54.    The paramilitary-style protesters were observed by Plaintiffs to be in possession of dangerous and deadly weapons, including combat knives, "blackjacks," wooden poles, shields made out of plastic, wood, and metal and pepper spray. Live coverage of the violent demonstration was broadcast by local and national media outlets.[31] ABC, Channel 7, KGO-TV reported that just after 5:30 p.m. crowds began forming outside of Sproul Plaza on the UC Berkeley campus.[32] At 6:01 p.m., unknown individuals began lobbing fireworks or small bombs at UC Berkeley police situated on the balcony of the MLK Student Center. A minute later, several people tore down the double-barricades and stormed the building. By 6:25 p.m., they had broken windows and set a diesel generator on fire. For more than an hour, the protesters ignored numerous dispersal orders by the UCPD. By 8:00 p.m., the mob had moved to nearby commercial establishments breaking the windows of a Chase Bank and shattering the doors of a Bank of America branch.

55.    The mob of paramilitary-style protesters performed their unlawful activity with the intent to cause death, great bodily harm and/or mayhem so as to oppress Trump and Yiannopolous supporters on account of their actual and/or perceived political beliefs, deny them their rights to peaceably assemble

---

[31] *See, e.g., id.*; ABC News report, February 2, 2017, https://www.youtube.com/watch?v=-PSYPrE5LrQ.

[32] ABC, Channel 7, KGO-TV, February 1, 2017, http://abc7news.com/news/violent-protests-over-yiannopoulos-event-bring-chaos-to-berkeley/1732466/.

FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

as protected by the California and U.S. Constitutions, prevent Plaintiffs' and others' participation in public political discourses protected by the California and U.S. Constitutions, and to generally act in an unlawful manner to oppress and suppress their political opponents.

56.    Defendants UCPD and UCPD DOES failed to preview the scene of the event to consider such things as access routes, staging areas, communication issues, possible weapons and containment issues. By failing to consider access routes and erecting double-barricades, UCPD and UCPD DOES left Plaintiffs and other innocent people vulnerable to assault by trapping them in Sproul Plaza without an escape route. Defendants UCPD and UCPD DOES recognized or should have recognized the risk of harm they created by corralling people within the confines of the plaza, unable to escape even into MLK Center due to the barricades.

57.    The on-scene police, including Defendants UCPD and UCPD DOES, made multiple feckless attempts to disperse the crowd with hollow threats of arrest and detentions, which only intensified the mayhem. UCPD Defendants and DOE UCPD Defendants knew of should have known that such dispersal orders would not only be ineffective but an aggravating factor in managing the crowd's behavior because they would or should have been made aware of Defendant BPD's "After Action Report" following a December 2014 Black Lives Matter demonstration concluding that issuing multiple dispersal orders "only served in the end to make the crowd larger."[33] Local law enforcement agencies frequently share their "After Action Reports" to learn from tactical mistakes made in the past so that they aren't repeated, and, on information and belief, Defendants BPD and UCPD engaged in cross-agency cooperation in planning for the Yiannopolous event.  Defendants UCPD and UCPD DOES as well as Defendants BPD and BPD DOES would also have known to have been "situationally aware" so that their Field Commanders and Mutual Aid Commanders would not be hamstrung by a lack of mission clarity.[34] Yet in spite of (1) prior violent protests of Yiannopolous' campus appearances at the

---

[33] Emilie Raguso, "BPD chief: Lessons learned in 2014 'Black Lives Matter' protests guided us during Milo demonstrations," Berkeleyside, February 5, 2017 ("The night of the tear gas use, Dec. 6, 2014, police said some members of the crowd attacked officers with projectiles, and that the police force later became surrounded at Telegraph Avenue and Bancroft Way. That night, BPD gave many dispersal orders, which the department said — it later realized — only served in the end to make the crowd larger.").

[34] *See, e.g.*, Berkeley Police Department, "Response to Civil Unrest: A Review of the Berkeley Police Department's Actions and Events of December 6 and 7, 2014," https://www.cityofberkeley.info/Police/Response-To-Civil-Unrest/lessons-learned.html ("Field Commanders and Mutual Aid Commanders perceived a lack of mission clarity. A lack of situational awareness contributed to confusion and delay in deployment and maneuver due to the evolving nature

FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

University of California, Davis, DePaul University and the University of Washington, (2) the anti-Trump protests that had been taking place around the country for more than a year, (3) letters and emails the university was receiving, (4) their monitoring of social media, (5) the long history of violent demonstrations at UC Berkeley and within the City of Berkeley and law enforcement lessons learned from those incidents, and (6) press reports, they completely and utterly lacked situational awareness and mission clarity.

58.     Instead of mobilizing to secure the perimeter of MLK Center with an armed show of force or tactically positioning roving uniformed patrols within the crowd, Defendants UCPD and UCPD DOES completely abandoned the plaza by withdrawing into the sheltered confines of MLK Center. By removing themselves from the plaza environs, Defendants UCPD and UCPD DOES left a total absence of law enforcement personnel where their presence was most needed before an already threatening situation could explode into violent turmoil. By retreating into the safe enclosure of MLK Center, Defendants UCPD and Doe officers effectively surrendered to the violent protesters and surrendered the plaza to their invasion. By their action, they effectively invited the protesters to act out their violent aggression against innocent members of the public.

59.     UCPD had erected a double metal barricade arranged in a triangulated configuration to prevent people from crossing it into MLK Center. The barricade featured signage stating "Do Not Cross." The barricade ran along the northern part of MLK Center, thus corralling people in Sproul Plaza in such a way as to prevent them from escaping the area without first confronting protesters. By erecting the barricades in such a way as to enclose the plaza and deprive innocent visitors access to a viable escape route, Defendants UCPD and UCPD DOES acted to control, restrict, and direct the movement of Plaintiffs.

60.     Defendants UCPD and UCPD DOES observed from their vantage points on the upper levels of MLK Center the coalescing of a crowd of black-clad rioters with banners and paramilitary formations, whereupon they pulled back and abandoned their positions in Sproul Plaza in the face of this new danger.  Plaintiffs and others entering Sproul Plaza became sitting ducks, unaware that Defendants UCPD and UCPD DOES had abandoned their tactical positions within the plaza. By pulling

_____

of the protest and its disruption by violent elements…. Situational Awareness is always a significant concern for Incident Command. Having a firm grasp on the situation as it evolves allows for better decisions. Incident Command gather situational awareness through updates communicated from personnel in the field as well as other sources, such as social media, video live streams and news media.")

Complaint                                                                                   Case No. 4:18-cv-0268

back their officers to the interior of MLK Center when they observed the masked, black-clad mob enter Sproul Plaza, Defendants UCPD and UCPD DOES affirmatively opened Sproul Plaza to the violent mob, thereby trapping unsuspecting visitors. By abandoning their positions within the plaza, Defendants UCPD and UCPD DOES affirmatively created a trap for unsuspecting visitors resulting in all exits being blocked by the violent mob. On information and belief, the decision by Defendants UCPD and UCPD DOES to withdraw into MLK Center where they could only observe the mayhem but take no direct action to intervene was a conscious and affirmative decision to stand down. By abandoning their tactical positions and issuing multiple dispersal orders backed by empty threats of arrest, Defendants UCPD and UCPD DOES did not merely withhold protective services, they left Plaintiffs and other innocent visitors in a worse position than had Defendants UCPD and UCPD DOES not acted. Indeed, Defendants UCPD and UCPD DOES left Plaintiffs and others in a situation more dangerous than the one in which they found them. Moreover, by abandoning their tactical positions and retreating into MLK Center, Defendants UCPD and UCPD DOES displayed deliberate indifference to the known and obvious danger of antifa revolutionary anarchists bearing weapons and occupying Sproul Plaza.

61.    On information and belief, Defendants UCPD and UCPD DOES were outmanned by the marauding horde of violent anarchists. But there would have been no reason to be undermanned had Defendants UCPD and UCPD DOES carefully and prudently assessed the potential threat level in advance as indicated by social media warnings and correspondence to the university, not to mention the likely intelligence they would have been receiving from other sources and the violent protests of the past both on and off campus.

62.    On information and belief, Defendants UCPD and UCPD DOES, failed to execute appropriate procedures reasonable under the circumstances as required by the CMP, such as making arrests and forcing the black-clad, flag-waving, face-concealed, weapons-bearing army of activists back from MLK Center and undertook their role as law enforcement officers with deliberate indifference to the safety of innocent patrons attending the Yiannopolous event. By their actions, they created a situation where the gangs of armed and masked marauding protesters could conduct their violent and unlawful activities with impunity. Defendants UCPD and UCPD DOES incited the crowd and then abandoned the field, thereby directly exposing Plaintiffs to the wrath of the armed and violent crowd, which was avoidable had they adopted a plausibly rational, tactical operations plan.

63.     Free to create mayhem wherever they might, the armed, masked protesters swarmed Sproul Plaza where Plaintiffs were attempting to attend the Yiannopolous event, unaware and unsuspecting of the danger awaiting them.

**Plaintiffs Jennings And Katrina Redelsheimer Are Brutally Assaulted**

64.     Plaintiffs Jennings and Redelsheimer purchased tickets to attend the Yiannopolous event. On February 1, 2017, at or about 6:10 p.m. Plaintiffs Jennings and Redelsheimer arrived at Cafe Strada on College Ave. near the UC Berkeley campus where they were joined by their friends, Plaintiff Hatch, Kiara Robles ("Robles") and several others. Robles received text messages that the event was canceled, but none were official. The group decided to confirm the cancellation by walking to MLK Center.

65.     As they arrived at Sproul Plaza around 6:30 p.m., news helicopters hovered overhead. Plaintiffs Jennings and Redelsheimer observed two or three uniformed officers on the steps of MLK Center and approximately a dozen officers on the ground floor at the top of the steps of the center. . Using a bullhorn, officers on the second floor balcony on the north side of the building made an announcement to disburse and declaring the crowd to be an unlawful assembly. Plaintiffs Jennings and Redelsheimer were situated on the east side of the MLK Center at that time and were therefore unable to hear the announcement.

66.     Within minutes the crowd seemed to cluster into groups, began chanting increasingly louder, raised banners, and formed a military-like marching formation. Approximately five minutes after the disbursal order was issued, members of the crowd began lobbing roman candles, fireworks, M80s, and cherry bombs at the MLK Center from a distance of approximately 150 feet. News reporters that had been seen present earlier had evacuated the area.

67.     Plaintiffs Jennings and Redelsheimer observed a young woman shouting at one of their friends standing to their left. As they watched the altercation, suddenly, without warning or provocation, a masked protester brutally struck Plaintiff Jennings with a wooden stick in the right temple. Plaintiff Redelsheimer came to her husband's aid by pushing the masked assailant back. As the assailant withdrew into the crowd, Plaintiffs Jennings and Redelsheimer were attacked with pepper spray and approximately five or six masked protesters began striking Plaintiff Jennings with sticks, viciously hitting him multiple times, pushing him to the ground and kicking him, causing multiple severe injuries. Both Plaintiffs Jennings and Redelsheimer suffered severe bodily injuries from the physical assaults to their bodies, including concussions, broken or bruised ribs, contusions and cuts, and from the pepper spray, temporarily blinding them, burning them and leaving welts on their skin.

68.     Plaintiffs Jennings and Redelsheimer observed a young woman shouting at one of their friends standing to their left. As they watched the altercation, suddenly, without warning or provocation, a masked protester brutally struck Plaintiff Jennings with a wooden stick. Plaintiff Redelsheimer came to her husband's aid by pushing the masked assailant back. As the assailant withdrew into the crowd, Plaintiffs Jennings and Redelsheimer were attacked with pepper spray and approximately five or six masked protesters began striking Plaintiff Jennings with sticks, viciously hitting him multiple times, pushing him to the ground and kicking him, causing multiple severe injuries. Both Plaintiffs Jennings and Redelsheimer suffered severe bodily injuries from the physical assaults to their bodies, including concussions, and from the pepper spray, temporarily blinding them, burning them and leaving welts on their skin.



*Figure 2: Injured Plaintiff Redelsheimer receiving treatment after being pepper-sprayed*

69.     At or around the time that the violent attack on Plaintiffs was occurring, Defendant Miller, using the fictitious name "Eugene V. Dabs" and Twitter handle "teen_archer," tweeted a picture while standing over Plaintiff Jennings as he lies unconscious on the ground. Defendant Miller captioned this tweet with "hey come get your boy. He got ROCKED #miloatcal."

FREEDOM X
11580 OLYMPIC BLVD, SUITE #00
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740



*Figure 3: Defendant Miller's image of Plaintiff Jennings lying unconscious posted on Instagram*

70.     Defendant Miller has admitted to physically beating Plaintiff Jennings by continuing to tweet that night "…body punches and then i [sic] take him down to the ground. Some good Samaritans come and pull me off of him and, as always happens in these cases, *i* take a couple of weak shots to the face."

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

FREEDOM X
11500 OLYMPIC BLVD, SUITE #400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740



*Figure 4: Screenshot of Defendant Miller's confession*

71.    Defendant Miller, and others, participated in, urged others to do so, and carried out an unlawful, violent battery upon, inter alia, Plaintiff Jennings. In acting as part of an unlawful assembly of anarchists, Defendant Miller is a concurrent joint tortfeasor by acting in concert and as part of the rioting mob for all harm caused thereby, whether physically caused by Defendant Miller's personal actions or not.

72.    Batterer Defendants and Riot Defendant DOES participated in, joined, colluded with, and acted in concert with Defendant Miller in violently attacking Plaintiffs Jennings and Redelsheimer. In acting as part of an unlawful assembly of violent demonstrators, Batterer Defendants and Riot DOES were concurrent joint tortfeasors responsible for all harm caused thereby.

73.    Defendant Mirabdal participated in, abetted, encouraged, and aided the violent battery upon Plaintiffs Jennings and Redelsheimer. Further, Defendant Mirabdal assaulted Plaintiff Jennings by

Complaint                                                                        Case No. 4:18-cv-0268

attempting to batter him after he had been beaten unconscious and was lying defenseless on the ground. By such actions, Defendant Mirabdal is jointly and severally liable with all concurrent joint tortfeasors for each and every one of the injuries suffered by Plaintiffs Jennings and Redelsheimer.

74. Batterer Defendants and Riot DOES participated in, abetted, encouraged, and aided the violent battery upon Plaintiffs Jennings and Redelsheimer. By such actions, Batterer Defendants and Riot DOES are jointly and severally liable with all concurrent joint tortfeasors for each and every of the injuries suffered by Plaintiffs, and each of them.

75. Such Plaintiffs have, as a proximate result and legal cause of such acts of such Defendants, been made to suffer serious physical injuries (including concussions, abrasions, and lacerations) resulting in substantial medical expenses, mental anguish, pain and discomfort, and other special and general damages, in an amount to be proven at trial.

76. Had Defendants UCPD and UCPD DOES not lacked situational awareness and mission clarity, Field Commanders and Mutual Aid Commanders would have been prepared to confront and resist the demonstrators when they turned violent. Tactical decisions that would have averted pandemonium and serious bodily harm to Plaintiffs were discarded. Defendants UCPD and UCPD DOES, through their affirmative tactical planning and execution of their affirmative tactical planning, failed to provide sufficient manpower to control the demonstrators. Defendants UCPD and UCPD DOES, through their affirmative tactical planning, chose to abandon the plaza for their own protection while leaving the innocent public exposed to violent assault. Defendants UCPD and UCPD DOES, through their affirmative tactical planning, chose to issue feckless disbursement orders, which had the predictable effect of angering and inciting the armed, masked mob of anarchists rather than convincing them to listen to reason or putting the fear of arrest in them. Defendants UCPD and UCPD DOES, through their affirmative tactical planning, erected barricades that closed off exit routes for innocent members of the public. Therefore, such official state action was the but-for, proximate, and legal cause of Plaintiffs' damages and losses that are alleged herein.

77. Had Defendants UCPD and UCPD DOES not erected the police barricade so as to completely block all egress from Sproul Plaza in a southern direction, including by locking and barricading the glass doors of the MLK Center (as armed and armored riot police impassively watched the violent attacks carried out upon Plaintiffs Jennings and Redelsheimer from mere feet away, while doing nothing to aid the victims or stop the perpetrators), Plaintiffs Jennings and Redelsheimer would not have been pinned down and could have escaped to the south and avoided the damages and losses

that are alleged herein. Therefore, such official state action was the but-for, proximate, and legal cause of Plaintiffs' damages and losses that are alleged herein.

78.    Additionally, the CMP policy at the time in question was to "[e]nsure that, to the degree possible, innocent uninvolved parties are evacuated from the immediate area of the disturbance."[35]  As such, it was part of Defendant UCPD's official policy to evacuate Plaintiffs Jennings and Redelsheimer from the scene of the riot before creating conditions that allowed the mob at the northwest corner of the MLK Center to form and leave the scene without facing arrest.  Defendants UCPD and UCPD DOES failed to follow the CMP guidelines and violated Defendant UCPD's own policies in this regard, thereby causing and/or increasing the risk of resulting harm suffered by Plaintiffs Jennings and Redelsheimer. Such violation of Defendant UCPD's official policy was motivated by, *inter alia*, an illegal motive by certain of Defendants to suppress the free speech and political participation of Plaintiffs, all in violation of Plaintiffs' rights as protected by the U.S. and California Constitutions.

79.    Cal. Pen. Code § 185 makes it unlawful for any person to wear any mask or personal disguise (whether complete or partial) for the purpose of evading or escaping discovery, recognition, or identification in the commission of a public offense. Plaintiffs were within the class of persons said statute was designed to protect. Had Defendant UCPD enforced this law by arresting demonstrators wearing mask or other disguises, Plaintiffs Jennings and Redelsheimer would not have been battered and injured.

80.    Plaintiffs Jennings and Redelsheimer were attacked mercilessly with the intent to cause death or great bodily harm, including using deadly weapons likely to inflict death or great bodily harm. As a proximate result of the attacks on Plaintiffs Jennings and Redelsheimer by violent protesters (including Defendants Miller and Mirabdal, Batterer DOE defendants) upon Plaintiffs Jennings and Redelsheimer. Plaintiffs Jennings and Redelsheimer and each of them have, as a proximate result and legal cause of such acts of such Defendants sustained serious physical injury, including, but not limited to, permanent physical scarring, broken ribs, concussions, loss of consciousness, contusions, bruises, and permanent physical and/or mental damage. Additionally, the CMP policy at the time in question was to "[e]nsure that, to the degree possible, innocent uninvolved parties are evacuated from the immediate area of the disturbance."[36] As such, it was part of Defendant UCPD's official policy to evacuate Plaintiffs Jennings and Redelsheimer from the scene of the riot before creating conditions that

---

[35] Exh. 1, *supra*.
[36] Exh. 1, *supra*.

Complaint                                                                                    Case No. 4:18-cv-0268

allowed the mob at the northwest corner of MLK Center to form and leave the scene without facing arrest. Defendants UCPD and UCPD DOES failed to follow the CMP guidelines and violated Defendant UCPD's own policies in this regard, thereby causing and/or increasing the risk of and resulting harm suffered by Plaintiffs Jennings and Redelsheimer. Such violation of Defendant UCPD's official policy was motivated by, *inter alia*, an illegal motive by certain of Defendants to suppress the free speech and political participation of Plaintiffs, all in violation of Plaintiffs' rights as protected by the U.S. and California Constitutions.

81.    Cal. Pen. Code § 185 makes it unlawful for any person to wear any mask or personal disguise (whether complete or partial) for the purpose of evading or escaping discovery, recognition, or identification in the commission of a public offense. Had Defendant UCPD enforced this law by arresting demonstrators wearing mask or other disguises, Plaintiffs Jennings and Redelsheimer would not have been battered and injured.

82.    Plaintiffs Jennings and Redelsheimer were attacked mercilessly with an intent to cause death or great bodily harm, including using deadly weapons likely to inflict death or great bodily harm. As a proximate result of the attacks on Plaintiffs Jennings and Redelsheimer by violent protesters (including Defendants Miller, Mirabdal and Riot DOES) upon Plaintiffs JENNINGS and Redelsheimer. Plaintiffs Jennings and Redelsheimer and each of them have, as a proximate result and legal cause of such acts of such Defendants sustained serious physical injury, including, but not limited to, permanent physical scarring, broken ribs, concussions, loss of consciousness, contusions, bruises, and permanent physical and/or mental damage.

**Plaintiff Hatch  Is Brutally Assaulted**

83.    Plaintiff Hatch met up with friends, including Plaintiffs Jennings and Redelsheimer, Robles, and others, at Café Strada on College Avenue near the UC Berkeley campus before heading to the Yiannopolous event on the evening of February 1, 2017. He arrived at the cafe between 5:30-6:00 p.m. wearing his red "Make America Great Again" hat ("MAGA hat"). The MAGA hat is worn by conservative supporters of President Trump. At or about 6:40 p.m., he and his friends began walking down Bancroft Way towards the Yiannopolous event.

84.    Upon arriving at Sproul Plaza, Plaintiff Hatch observed a large crowd of people. A random bystander tried to knock off one of the MAGA hats worn by one of his friends. Plaintiff  Hatch observed a tree on fire. During this time, he and his friends were trying to find the location where they

FREEDOM X
11590 OLYMPIC BLVD, SUITE #00
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

Complaint                                                                                                    Case No. 4:18-cv-0268

were to line up to be admitted into MLK Center. He observed several people shouting angrily but did not observe any law enforcement officials present.

85.     The crowd size was increasing as Plaintiff Hatch moved to the front stairs of MLK Center. He observed a horde of demonstrators with flagpoles and weapons walking along Bancroft Way toward Telegraph Ave. Plaintiff  Hatch  was standing in front of the barricades when he observed the horde of "black bloc" demonstrators approach him and his friends. He observed one of the demonstrators strike Plaintiff Redelsheimer with a flagpole. Then, without notice or provocation, a demonstrator hit him with pepper spray directly in his eyes. Plaintiff Hatch ripped off his glasses and with eyes burning was instantly blinded. He experienced intense burning to his face and eyes. As he leaned over a barricade, he took blows from someone hitting him in the back with a flagpole. He managed to climb over a barricade, but was trapped in between barricades configured to form a triangle.

86.     Plaintiff Hatch began screaming for help. Someone lifted him over the second barricade, but he was unable to see who it was. Groping around, the two were able to connect and he pulled his friend over the barricades. They ran up the steps of MLK Center shouting for help until someone pulled them inside. At the time, Plaintiff Hatch thought he had been pulled into MLK Center by a police officer, but when he later viewed video of the incident on YouTube and Instagram he saw that it was a good Samaritan.[37] Had Defendants UCPD and UCPD DOES been tactically positioned along the barricaded perimeter, the violent attacks on Plaintiff Hatch and others could have been thwarted.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

[37] https://www.youtube.com/watch?v=GSMKGRyWKas&feature=youtu.be; https://www.instagram.com/p/BQAFESPj1aM/

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

Complaint                                                                 Case No. 4:18-cv-0268



*Figure 5: Screenshot of YouTube video of Plaintiffs Redelsheimer*

*and Hatch after being pepper-sprayed and hit multiple times with flag poles.*

87.      Philip Fabian posted a video of the incident on YouTube along with the caption under the video identifying him as the person who lifted Plaintiff Hatch over the second barrier:

> In the video I posted, protesters, covered in masks, pepper sprayed what I believe could've been attendees to the speech tonight. What happened was horrible - they were sprayed, pinned up against the metal barricades while protesters struck them in the back and on their heads with wood sticks. The man in the orange bill hat was me - they were crying to get them to stop and to help them get out. I jumped the barricades and pulled them out. One of these people, in the first picture was a woman who was being struck continuously by a male assailant. I pulled her out as well. One man was no [sic] so lucky as he was pulled away by the protesters as they ganged up on him and continued to hit him on the head. You don't see him in the video but he lay there unconscious. That did not stop people from continuing to kick him. These victims were trying to leave the whole time.[38]

88.      Plaintiff Hatch never heard the disbursal orders while the mob was attacking him. Plaintiff Hatch suffered welts and burns from the pepper-spray. His back was bruised the next morning. The next day he took off from work while recovering from the stress caused by the dangerous incident. Plaintiff Hatch continues to experience negative psychological effects from the incident at Sproul Plaza.

89.      Had Defendants UCPD and UCPD DOES not lacked situational awareness and mission clarity, Field Commanders and Mutual Aid Commanders would have been prepared to confront and resist the demonstrators. Defendants UCPD and UCPD DOES simply failed to make the tactical decisions that would have averted pandemonium. Defendants UCPD and UCPD DOES, through their

---

[38] The person lying unconscious on the ground and being kicked is Plaintiff JENNINGS.

FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

affirmative tactical planning and execution of their affirmative tactical planning, failed to provide sufficient manpower to overwhelm the demonstrators. Defendants UCPD and UCPD DOES, through their affirmative tactical planning, chose to abandon the plaza for their own protection while leaving the innocent public exposed to violent assault. Defendants UCPD and UCPD DOES, through their affirmative tactical planning, chose to issue feckless disbursement orders, which had the predictable effect of arousing the angry mob of anarchists rather than convincing them to listen to reason or putting the fear of arrest in them. Defendants UCPD and UCPD DOES, through their affirmative tactical planning, erected barricades that closed off exit routes for innocent members of the public, leaving them, in effect, sitting ducks. Therefore, such official state action was the but-for, proximate, and legal cause of Plaintiffs' damages and losses that are alleged herein.

90.    Had Defendants UCPD and UCPD DOES not erected the police barricade so as to completely block all egress from Sproul Plaza in a southern direction, Plaintiff Hatch would not have been pinned down and could have escaped to the south and avoided the damages and losses that are alleged herein. Therefore, such official state action was the but-for, proximate, and legal cause of Plaintiff's damages and losses that are alleged herein.

91.    Additionally, the CMP policy at the time in question was to "[e]nsure that, to the degree possible, innocent uninvolved parties are evacuated from the immediate area of the disturbance." As such, it was part of Defendant UCPD's official policy to evacuate Plaintiff Hatch from the scene of the riot before creating conditions that allowed the mob at the northwest corner of MLK Center to form and leave the scene without facing arrest. Defendants UCPD and UCPD DOES failed to follow the CMP guidelines and violated Defendant UCPD's own policies in this regard, thereby causing and/or increasing the risk of resulting harm suffered by Plaintiff Hatch. Such violation of Defendant UCPD's official policy was motivated by, inter alia, an illegal motive by certain of Defendants to suppress the free speech and political participation of Plaintiffs, all in violation of Plaintiffs' rights as protected by the U.S. and California Constitutions.

92.    Cal. Pen. Code § 185 makes it unlawful for any person to wear any mask or personal disguise (whether complete or partial) for the purpose of evading or escaping discovery, recognition, or identification in the commission of a public offense. Had Defendant UCPD enforced this law by arresting demonstrators wearing mask or other disguises, Plaintiff Hatch would not have been battered and injured.

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

FREEDOM X
11550 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

93.     Plaintiff Hatch was attacked mercilessly with an intent to cause death or great bodily harm, including using deadly weapons likely to inflict death or great bodily harm. As a proximate result of the attacks on Plaintiff Hatch by violent protesters (including Defendants Miller, Mirabdal and Riot DOES), and each of them, upon Plaintiff Hatch has, as a proximate result and legal cause of such acts of said Defendants, sustained serious physical injury, including, but not limited to, contusions, bruises, and permanent mental damage.

### Plaintiff Donald Fletcher Is Brutally Assaulted

94.     Plaintiff Fletcher and friends were at a bar when they learned on their smartphones that the Yiannopolous event had been cancelled. They left the bar to see what was going on when they were ambushed by violent, masked anarchists along Bancroft Ave. Plaintiff Fletcher was severely beaten unconscious and kicked to the ground. A video of the incident shows the attack and Plaintiff Fletcher's body on the ground.[39]



*Figure 6: Screenshot from YouTube video of Plaintiff Fletcher lying unconscious on the street*

95.     There was no police presence along Bancroft Way despite the fact that the City Defendants and City DOES should have provided support along the street in anticipation of demonstrations planned or reasonably expected to take place to protest the Yiannopolous event.

96.     Plaintiff Fletcher was transported by ambulance to Highland Hospital in Oakland where he was admitted and remained overnight. Plaintiff Fletcher continues to experience the negative psychological effects of the incident.

---

[39] https://youtu.be/qvA2wjtKG20?t=30s

Complaint                                                                    Case No. 4:18-cv-0268

97.     Had the City Defendants and City DOES not lacked situational awareness and mission clarity, Field Commanders and Mutual Aid Commanders would have been prepared to confront and resist the demonstrators. Defendants City Defendants and City DOES simply failed to make the tactical decisions that would have averted pandemonium. The City Defendants, through their affirmative tactical planning, failed to occupy and exercise proper law enforcement duties to protect the public from demonstrators committing violence on city property.  The City Defendants, through their affirmative tactical planning, chose to abandon the commercial and public areas surrounding MLK Center for their own protection while leaving the innocent public exposed to violent assault. Therefore, such official state action was the but-for, proximate, and legal cause of Plaintiffs' damages and losses that are alleged herein.

98.     Cal. Pen. Code § 185 makes it unlawful for any person to wear any mask or personal disguise (whether complete or partial) for the purpose of evading or escaping discovery, recognition, or identification in the commission of a public offense. Had the City Defendants enforced this law by arresting demonstrators wearing mask or other disguises, Plaintiff Fletcherwould not have been battered and injured.

99.     Plaintiff Fletcher was attacked mercilessly with an intent to cause death or great bodily harm, including using deadly weapons likely to inflict death or great bodily harm. As a proximate result of the attacks on Plaintiff Fletcher by violent protesters (Riot DOES), and each of them, upon him, Plaintiff Fletcher has, as a proximate result and legal cause of such acts of said Defendants, sustained serious physical injury, including, but not limited to, concussions, loss of consciousness, contusions, bruises, and permanent physical and/or mental damage.

## FIRST CAUSE OF ACTION

Violation of the Fourteenth Amendment (42 U.S.C. § 1983)

(All Plaintiffs Against All UC Berkeley Defendants and UC Berkeley DOES)

100.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

101.     This claim is against UC Berkeley Defendants and UC Berkeley DOES in their official and individual capacities and against Dirks in his individual capacity. Each of these Defendants, acting under color of state law, took affirmative actions to create a dangerous environment and/or expose Plaintiffs to a dangerous mob, to wit, Defendants:

33

FREEDOM X
11350 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

a.  issued feckless disbursal orders and threats of arrest from the safety of MLK Center balconies, which were either not delivered sufficiently loud enough for the crowd to hear or which were delivered from a physical vantage point that failed to control the crowd and conversely acted to further incite rioters;

b.  erected barricades that prevented Plaintiffs from exiting through alternative, safe pathways and forcing them to encounter a violent mob;

c.  failed to aid Plaintiffs upon witnessing the many assaults, batteries, and false imprisonments occurring under their watch;

d.  failed to comply with the recommended procedures of the CMP and

e.  retreated to the sanctuary of MLK Center to observe unlawful activity without making arrests or interfering with the activity;

f.  failed to adhere to UCPD approved crowd control tactics necessary to disperse or arrest individuals who were committing unlawful acts against the public and the University;

g.  failed to plan for access routes, staging areas, communication issues, and possible weapons and containment issues,

h.  failed to use chemical agents, smoke, or other less lethal devices to disperse the crowd; and

i.  failed to collaborate and coordinate with other law enforcement agencies in anticipation of large demonstrations.

102.    As a direct result of UC Berkeley Defendants' and UC Berkeley DOES' commands, inadequate planning, and feckless execution of their duties, Plaintiffs were directed into a violent mob, prevented from leaving through alternative, safer paths, and subjected to attacks perpetrated on Plaintiffs, which attacks would not have occurred but for their affirmative actions. Rather than mitigate the developing violence, UC Berkeley Defendants and UC Berkeley DOES put Plaintiffs in a worse position than had they not acted.

103.    The individual UC Berkeley Defendants had actual, ample, and advanced warning of the likelihood that violence would occur at the Yiannopolous event, as evidenced by, inter alia, (1) prior violent protests and demonstrations targeting and disrupting Yiannopolous' campus appearances at the University of California, Davis, DePaul University and the University of Washington; (2) anti-Trump protests and demonstrations that had been taking place around the country for more than a year; (3) letters and emails protesting the Yiannopolous event the university was receiving; (4) social media

34

announcements of planned protests and demonstrations; (5) the long history of violent demonstrations at UC Berkeley and within the City of Berkeley; (6) law enforcement lessons learned from prior demonstrations; (7) press reports; and (8) the police officers' use of riot gear to protect themselves from the same dangers to which Plaintiffs were exposed.

104.    Accordingly, the individual UC Berkeley Defendants acted with deliberate indifference and reckless and/or conscious disregard of a known and obvious danger.

105.    As a direct and proximate consequence of the individual UC Berkeley Defendants' and UC Berkeley DOES' violations of the 14th Amendment to the U.S. Constitution and Plaintiffs' federal civil rights under 42 U.S.C. § 1983, Plaintiffs were physically, mentally, and emotionally injured and damaged, in addition to being deprived of their constitutional rights.

106.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and/or costs pursuant to 42 U.S.C. § 1988.

107.    Plaintiffs are also entitled to compensatory damages and seek injunctive relief, enjoining the individual UC Berkeley Defendants and UC Berkeley DOES from further violating Plaintiffs civil rights, including by requiring the individual UC Berkeley Defendants and UC Berkeley DOES to provide Plaintiffs at future events open to the public the ability to leave through safe routes, make reasonable efforts to protect Plaintiffs at all future public events at MLK Center from physical attacks or other displays of violence by protesters where Plaintiffs are made to leave through a particular pathway; prohibiting the UC Berkeley Defendants and UC Berkeley DOES from instructing the police, fire department employees, or other agents under their control to deny Plaintiffs the ability to leave through alternative exits, to direct Plaintiffs toward danger, and/or fail to intervene in attacks made on Plaintiffs   after having placed Plaintiffs in danger; and prohibiting the individual UC Berkeley Defendants and UC Berkeley DOES from maintaining a policy or practice that allows, permits, or encourages these violent acts.

## SECOND CLAIM FOR RELIEF

Violation of the Fourteenth Amendment (42 U.S.C. § 1983 - Monell)

(All Plaintiffs Against the City Defendants and City DOES)

108.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

Complaint                                                                                    Case No. 4:18-cv-0268

109.    City Defendants and City DOES are responsible for maintaining law and order within the City of Berkeley. The BPD has created a Crowd Management Team ("CMT") of police officers "trained for the often challenging task of separating illegal activity from lawful protest for the protection of life and property during an event. preventing property damage and injuries."[40] CMT members "are on call for any spontaneous events that can develop, large street parties that become difficult to manage or riots."[41] In recent years, the CMT has been called to manage several series of ongoing protests and expressions related to political issues."[42] CMT members "stand by to preserve the overall peace and have a keen readiness if the group's or crowd's energies suddenly change."[43] The CMT is commanded by Lieutenant Randolph Files. The CMT assistant commander is Lieutenant Dave Frankel.

110.    In response to civil unrest, Defendant BPD prepared a review of Berkeley Police Actions and events that occurred on December 6 and 7, 2014.[44] During the month of December 2014, the BPD experienced "unprecedented civil unrest, the likes of which have not come to our city in the last 20 years."[45] On December 1, 2014, Defendant BPD received information from various sources that a march was scheduled to take place on December 6, 2014, in Berkeley.[46] The march was advertised as a "From Ferguson to Ayotzinapa March - March Against State Violence-Remember the Dead." Organizers urged attendees to "Fight like hell," "Bring masks" and reminded the public of previous mass uprisings that had taken place.[47] Online flyers for the event showed a picture of a man sitting on an overturned police car.[48] Oakland and San Francisco had just experienced "Fuck the Police" (FTP) marches which resulted in mob violence, damage to businesses, looting, vandalism to vehicles, and attacks on officers.[49]

111.    The civil unrest during December 2014 occurred in the exact same locations as the civil unrest on February 1, 2017, around MLK Center, Bancroft Way and Telegraph Ave. The report produced

---

[40] Berkeley Police Department Crowd Management Team,
https://www.cityofberkeley.info/Police/Home/Crowd_Management_Team.aspx.
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] Berkeley Police Department, "Response to Civil Unrest December 6th and 7th, 2014,"
https://www.cityofberkeley.info/Police/Home/Crowd_Management_Team.aspx.
[45] *Id.*, "Acknowledgement."
[46] *Id.*, p. 1.
[47] *Id.*
[48] *Id.*
[49] *Id.*

FREEDOM X
11500 OLYMPIC BLVD, SUITE #400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

Complaint                                                                Case No. 4:18-cv-0268

from the review included an extensive section describing "Lessons Learned."[50] Among the lessons learned was that "[p]rotest organizers used social media to good effect."[51] The report goes on to state:[52]

> They recruited large numbers by advertising the event on Facebook and Twitter. They used Twitter to coordinate movements and to regroup when they had been split. They used Twitter to broadcast the arrival and deployment of mutual aid resources to the staging area. Oakland and SFPD have seen crowds intentionally breaking apart and using Twitter to converge on a new location. Members of the crowd were also live streaming protests over various platforms….

> One of the problems faced at Telegraph Ave. and Bancroft Way was that the group went from 200 protesters to 1000-1500 protesters in a short amount of time. Part of this group had heard about what was taking place from friends on social media. The crowd was comprised of mostly newly arrived protesters who had not observed any of the lawlessness which led to the issuance of the dispersal orders.

112.    Pursuant to the UCPD's CMP, the City Defendants and City DOES were notified by, liaised and developed a coordination plan with the UC Berkeley Defendants regarding possible effects, including the foreseeable prospect of violent demonstrations and civil unrest, the Yiannopolous event would have in their jurisdiction.

113.    Had the City Defendants and City DOES staged armed patrols along Bancroft Way leading into MLK Center, they would have created a deterrent to black-uniformed mobs carrying flagpoles and weapons from entering Sproul Plaza.

114.    Had the City Defendants and City DOES enforced the law by arresting masked protesters, they would have prevented the foreseeable mayhem that occurred.

115.    The City Defendants and City DOES are liable for the actions taken by the individual City and BPD Defendants, as alleged above, for at least the following reasons.

116.    The individual City Defendants and City DOES acted in accordance with officially adopted and promulgated City policies, requiring that officers neither provide a deterring presence at locations leading into Sproul Plaza nor intervene in the attacks committed upon Plaintiff Fletcher by anti-Trump/Yiannopolous protesters. Such policies include, but are not limited to, the policies and procedures promulgated in the BPD's Duty Manual and the City's action plan created by the City, Police Chief Greenwood and/or City DOES specifically for the Yiannopolous event.

---

[50] *Id.*, pp. 41-58.
[51] *Id.*, p. 45.
[52] *Id.*

Complaint                                                                                      Case No. 4:18-cv-0268

FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

117.   Police Chief Greenwood acted as a final policymaker for the City when setting the City's policy regarding the handling of civil disturbances, including by instructing the other individual City Defendants and City DOES, as well as other BPD police and mutual aid officers, to open a path for demonstrators to enter Sproul Plaza and to not intervene in the attacks committed on Trump/Yiannopolous supporters as Plaintiffs entered and exited the campus onto City streets.

118.   City Defendants and City DOES failed to adequately train or supervise the police officers. Specifically, the City failed to train its officers to protect Plaintiffs from danger created by the individual City Defendants' and City DOES' actions; failed to enforce Cal. Pen. Code § 185 by arresting masked protesters; and failing to present a show of force along Bancroft Way to deter violence from erupting by anarchists.

119.   As discussed above, City Defendants and City DOES had ample and advanced warning that violence was likely to occur, because they possessed knowledge of (1) prior violent protests and demonstrations targeting and disrupting Yiannopolous' campus appearances at the University of California, Davis, DePaul University and the University of Washington; (2) anti-Trump protests and demonstrations that had been taking place around the country for more than a year; (3) letters and emails protesting the Yiannopolous event the university was receiving; (4) social media announcements of planned protests and demonstrations; (5) the long history of violent demonstrations at UC Berkeley and within the City of Berkeley; (6) law enforcement lessons learned from prior demonstrations; and (7) press reports.

120.   Despite this knowledge, the City failed to train its officers to appropriately respond to similar acts of violence that occurred in the past, including in December 2014, just three years earlier, at the very site of the violent demonstrations protesting the Yiannopolous event. Accordingly, there was an obvious need for the officers to receive appropriate training, which the City Defendants and City DOES did not provide.

121.   Police Chief Greenwood ratified the individual City Defendants and City DOES' unconstitutional acts by publicly declaring his support for those actions and by failing to reprimand officers for their conduct, indicating that the City is likely to engage in such behavior again.

122.   As a direct and proximate consequence of the individual City Defendants' and City DOES s' violations of the Plaintiffs' federal civil rights under 42 U.S.C. § 1983 and the Fourteenth Amendment, Plaintiffs were physically, mentally, and emotionally injured and damaged, in addition to being deprived of their constitutional rights.

123.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and/or costs pursuant to 42 U.S.C. § 1988.

124.    Plaintiffs are also entitled to compensatory damages and seek injunctive relief, enjoining the individual City of Berkeley Defendants and City of Berkeley DOES from further violating Plaintiffs civil rights, including by requiring the individual City of Berkeley Defendants and City of Berkeley DOES to provide Plaintiffs at future events open to the public the ability to leave through safe routes, make reasonable efforts to protect Plaintiffs at all future public events at MLK Center from physical attacks or other displays of violence by protesters where Plaintiffs are made to leave through a particular pathway; prohibiting the City of Berkeley Defendants and City of Berkeley DOES from instructing the police, fire department employees, or other agents under their control to deny Plaintiffs the ability to leave through alternative exits, to direct Plaintiffs toward danger, and/or fail to intervene in attacks made on Plaintiffs after having placed Plaintiffs in danger; and prohibiting the individual City of Berkeley Defendants and City of Berkeley DOES from maintaining a policy or practice that allows, permits, or encourages these violent acts.

### THIRD CLAIM FOR RELIEF

Violation of Ralph Act (Cal. Civ. Code 51.7 & 52)

(All Plaintiffs Against All Defendants)

125.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

126.    All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation.

127.    Batterer Defendants and Riot DOES, and each of them, are liable to Plaintiffs and as alleged above, Batterer Defendants Miller and Mirabdal are specifically liable to Plaintiff Jennings for committing violent assaults causing severe bodily and emotional injury because of Plaintiffs' pro-Trump/Yiannopolous political viewpoints and perceived conservative/Republican political affiliations.

128.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered harm, including physical bodily injury and emotional distress.

129.    City Defendants, City DOES, UC Berkeley Defendants and UC Berkeley DOES, and each of them, are liable to Plaintiffs for aiding, inciting and/or conspiring to deny Plaintiffs the right to

FREEDOM X
11550 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

be free from violence, or intimidation by threat of violence, because of their political viewpoints and conservative/Republican political affiliations.

130.   City Defendants, City DOES, UC Berkeley Defendants and UC Berkeley DOES, and each of them, are therefore liable for each and every offense for the actual damages suffered by each Plaintiff denied his/her rights, exemplary damages, a civil penalty of $25,000 per Plaintiff per Defendant for each deprivation of a right, treble damages but not less than $1,000 per Plaintiff per Defendant and attorney's fees.

131.   As a proximate result of Defendants' wrongful conduct as alleged more fully above in this Complaint, Plaintiffs suffered and continue to suffer damages as set forth herein.

### FOURTH CLAIM FOR RELIEF

Violation of Bane Act (Cal. Civ. Code §§ 52 & 52.1)

(All Plaintiffs Against All Defendants)

132.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

133.   The violent demonstration at the Yiannopolous Event and resulting attacks upon Plaintiffs, as described more fully above, were motivated by hostility toward Plaintiffs' actual or perceived political viewpoints, specifically Plaintiffs' support for President Trump and/Yiannopolous.

134.   City Defendants, City DOES, UC Berkeley Defendants and UC Berkeley DOES, by committing the above-described conduct, interfered, and attempted to interfere, by threats, intimidation, and coercion, with Plaintiffs' peaceable exercise and enjoyment of rights secured by the Constitution and the laws of the United States and California, including the deprivation of Plaintiffs' Due Process rights under the Fourteenth Amendment.

135.   City Defendants and City DOES, by committing the above-described conduct, instructed police officers to neither provide a deterring presence at locations leading into Sproul Plaza, intervene in the attacks committed upon Plaintiff Fletcher by anti-Trump/Yiannopolous protesters nor enforce the law by arresting masked demonstrators, thereby interfering with Plaintiffs' peaceable exercise and enjoyment of rights secured by the Constitution and the laws of the United States and California, including the deprivation of Plaintiffs' Due Process rights under the Fourteenth Amendment.

136.   The UC Berkeley Defendants and UC Berkeley DOES, by committing the above-described conduct, created conditions at Sproul Plaza that, for all practical purposes, gave demonstrators license to carry out their violent actions on innocent members of the public, including Plaintiffs,

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

subjecting them to the threats, intimidation and injury depriving them of their peaceable exercise and enjoyment of rights secured by the Constitution and the laws of the United States and California, including the deprivation of Plaintiffs' Due Process rights under the Fourteenth Amendment.

137.   The Riot Defendants, by committing the above-described conduct, engaged in unlawful conduct causing Plaintiffs' great bodily harm and threatening, intimidating Trump and Yiannopolous supporters on account of their actual and/or perceived political beliefs.

138.   Such actions constitute threats, intimidation, or coercion and resulted in violations of Plaintiffs civil and statutory rights. By engaging in such conduct, Defendants violated Plaintiffs' rights under California Civil Code Section 51.7 to be free from threats, intimidation, or coercion committed against them because of their political viewpoints.

139.   As a result of the wrongful acts alleged herein, Plaintiffs are entitled to compensatory damages in an amount to be proven at trial, civil penalties of $25,000 per Plaintiff per Defendant, attorney's fees, and punitive damages for each violation.

140.   Defendants committed the wrongful acts alleged herein maliciously, fraudulently, and oppressively, and/or with reckless and conscious disregard for the rights and safety of Plaintiffs and/or with an improper and evil motive amounting to malice. Plaintiffs are thus entitled to recover punitive damages, in addition to compensatory damages, from Defendants in an amount according to proof at trial.

141.   Plaintiffs seek injunctive relief, enjoining the City Defendants, City DOES, UC Berkeley Defendants and UC Berkeley DOES from further violating Plaintiffs' civil rights, including by requiring the City Defendants, City DOES, UC Berkeley Defendants and UC Berkeley DOES to protect attendees of all future political rallies in the City Defendants, City DOES, UC Berkeley Defendants and UC Berkeley DOES from physical attacks or other displays of violence by protesters; prohibiting the City Defendants, City DOES, UC Berkeley Defendants and UC Berkeley DOES from instructing the police, fire department employees, or other agents under their control to deny event attendees the ability to leave through alternative exits, to direct event attendees toward danger, and/or fail to intervene in attacks made on the event attendees after having placed the attendees in danger; and prohibiting the City Defendants, City DOES, UC Berkeley Defendants and UC Berkeley DOES from maintaining a policy or practice that allows, permits, or encourages these violent acts.

/ / /

/ / /

Complaint                                                                 Case No. 4:18-cv-0268

**FIFTH CLAIM FOR RELIEF**

Civil Battery and Conspiracy

(By all Plaintiffs Against Batterer Defendants and Riot DOES)

142.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

143.    Defendants named herein did unlawfully and with intentional malice strike the persons of Plaintiffs.

144.    Such unlawful and offensive striking was not consented to, and did in fact cause substantial harm, injury, pain, suffering, and other compensable losses to Plaintiffs, and each of them, all in an amount to be proven at trial.

145.    Such actions by Defendants were part and parcel of a joint action, conspiracy, or joint endeavor by all Defendants named herein, and as such all such Defendants are jointly and severally liable for all harm suffered by Plaintiffs, and each of them.

146.    The actions complained of herein were undertaken with malice, an intent to cause death or great bodily harm to Plaintiffs, and were in conscious disregard for the rights of Plaintiffs, including the conscious and willful suppression of Plaintiffs' rights under the California and US Constitution to peaceably assemble, engage in public political debate, and freedom of association.

147.    Defendants are therefore liable to Plaintiffs for general damages, actual or special damages incurred to date, actual or special damages to be incurred in the future, compensation for ongoing and future harms, and punitive or exemplary damages against each and every defendant.

**SIXTH CLAIM FOR RELIEF**

Negligence

(By Plaintiffs Against All Defendants)

148.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

149.    Each of the Defendants named herein had a duty to conduct their activities so as to not unduly create a risk of harm to others, including Plaintiffs.

150.    As described above, each of the Defendants breached this duty, resulting in compensable harms being suffered by each Plaintiff.

151.    The actions complained of herein by all Defendants were undertaken with malice, an intent to cause death or great bodily harm to Plaintiffs, and were in conscious disregard for the rights of

42

Complaint                                                                 Case No. 4:18-cv-0268

Plaintiffs, including the conscious and willful suppression of Plaintiffs' rights under the California and US Constitution to peaceably assemble, engage in public political debate, and freedom of association.

152.    Defendants are therefore liable to Plaintiffs for general damages, actual or special damages incurred to date, actual or special damages to be incurred in the future, compensation for ongoing and future harms as against all Defendants, and for punitive or exemplary damages.

## SEVENTH CLAIM FOR RELIEF

Premises Liability; Negligence

(By Plaintiffs Against Defendant Regents)

153.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

154.    Plaintiffs are informed and believe and thereon allege that Defendant Regents is the owner and operator of the UC Berkeley property on which the herein alleged assault and batteries occurred against Plaintiffs.

155.    As owner and operator of the property, Defendant Regents owed a duty to protect those lawfully assembled on said property against dangerous conditions about which Defendant Regents knew or should have known or were reasonably placed on notice thereof.

156.    Plaintiffs are informed and believe and thereon allege that numerous times throughout the UC Berkeley's history controversial guest speakers have incited violence on UC Berkeley property placing Defendant Regents on notice that a dangerous condition was likely to occur in similar circumstances. Plaintiffs are further informed and believe and thereon allege that Defendant Regents was on notice of the potential for a violent and dangerous condition to occur and persist on their property as alleged herein and possessed actual knowledge that a dangerous condition would be created.

157.    On February 1, 2017, Defendant Regents created a dangerous condition on its property. As a proximate result of Defendant Regent's wrongful conduct as alleged more fully above in this Complaint, Plaintiffs suffered and continue to suffer damages as set forth herein.

## EIGHTH CLAIM FOR RELIEF

Intentional Infliction of Emotional Distress

(By All Plaintiffs Against All Defendants)

158.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

FREEDOM X
11590 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

43

159.     Plaintiffs are informed and believe and thereon allege that the conduct of the Defendants, and each of them, in creating the conditions leading to Plaintiffs' injuries constituted extreme and outrageous conduct, that such conduct was done with a reckless disregard of the likelihood that it would inflict severe emotional distress on Plaintiffs.

160.     Plaintiffs are therefore entitled to punitive damages for the extreme and outrageous actions of Defendants.

### NINTH CLAIM FOR RELIEF

False Imprisonment

(Plaintiffs Jennings, Redelsheimer and Hatch

Against UC Berkeley Defendants and Batterer Defendants)

161.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

162.     UC Berkeley Defendants and UC Berkeley DOES intentionally deprived Plaintiffs Jennings, Redelsheimer and Hatch of their freedom of movement by the creation of an enclosed pen from which they were unable to escape during the violent activities that occurred at the Yiannopolous event in Sproul Plaza. Batterer Defendants and Riot DOES intentionally deprived Plaintiffs Jennings, Redelsheimer and Hatch of their freedom of movement by the use of threats, force, and intimidation.

163.     The confinement, restraint, and/or detention compelled Plaintiffs Jennings, Redelsheimer and Hatch to be subjected to physical injury.

164.     Plaintiffs Jennings, Redelsheimer and Hatch did not knowingly or voluntarily consent to this confinement, restraint, and/or detention.

165.     As a direct and proximate result of UC Berkeley Defendants', UC Berkeley DOES', Batterer Defendants' and Riot DOES' wrongful conduct, Plaintiffs Jennings, Redelsheimer and Hatch were harmed in an amount according to proof at trial.

166.     Plaintiffs Jennings, Redelsheimer and Hatch are informed and believe and allege thereon that such acts directed towards them were malicious and belligerent, and the acts were done with a conscious disregard of Plaintiffs' Jennings, Redelsheimer and Hatch right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code § 3294, entitling Plaintiffs Jennings, Redelsheimer and Hatch to punitive damages, in addition to

FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

compensatory damages, in an amount appropriate to punish and set examples of UC Berkeley Defendants and Batter Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs with the following relief:

1) All damages legally and/or proximately caused to Plaintiffs by Defendants in an amount to be determined at trial;

2) A declaration that Defendants UC Berkeley and UC Berkeley DOES violated 42 U.S.C. § 1983;

3) A declaration that Defendants UC Berkeley and UC Berkeley DOES violated the First and Fourteenth Amendments to the United States Constitution;

4) A declaration that Defendants City of Berkeley and City of Berkeley DOES violated the First and Fourteenth Amendments to the United States Constitution;

5) Nominal damages for the past loss of their constitutional rights as set forth in this Complaint;

6) Compensatory damages according to proof;

7) Punitive and exemplary damages for all claims for which such damages are authorized;

8) Temporary, preliminary, and permanent injunctive relief enjoining the individual City of Berkeley Defendants, City of Berkeley DOES, UC Berkeley Defendants and UC Berkeley DOES from further violating Plaintiffs civil rights, including by requiring the individual City of Berkeley Defendants, City of Berkeley DOES, UC Berkeley Defendants and UC Berkeley DOES to provide Plaintiffs at future events open to the public the ability to leave through safe routes, make reasonable efforts to protect Plaintiffs at all future public events at MLK Center from physical attacks or other displays of violence by protesters where Plaintiffs are made to leave through a particular pathway; prohibiting the City of Berkeley Defendants, City of Berkeley DOES, UC Berkeley Defendants and UC Berkeley DOES from instructing the police, fire department employees, or other agents under their control to deny Plaintiffs the ability to leave through alternative exits, to direct Plaintiffs toward danger, and/or fail to intervene in attacks made on Plaintiffs after having placed Plaintiffs in danger; and prohibiting the individual City of Berkeley Defendants, City of Berkeley DOES, UC Berkeley Defendants and UC Berkeley DOES from maintaining a policy or practice that allows, permits, or encourages these violent acts;

FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

SHAWN STEEL LAW FIRM
3010 OLD RANCH PKWY, SUITE 260
SEAL BEACH, CA 90740

Complaint                                                                        Case No. 4:18-cv-0268

9)   Civil penalties under Cal. Civ. Code §§ 51.7, 52 & 52.1;

10)   An award of reasonable attorneys' fees, costs and expenses pursuant to 42 U.S.C. § 1988 other applicable law;

11)   Costs of suit incurred herein; and

12)   Such other and further relief as the Court deems just and proper.

SHAWN STEEL LAW FIRM

By:   _____/s Shawn Steele_____
SHAWN STEEL, ESQ. (SBN: 80706)
ShawnSteel@shawnsteel.com
Alexander C. Eisner, Esq. (SBN: 298968)
AlexanderEisner@shawnsteel.com
3010 Old Ranch PKWY, Suite 260
Seal Beach, CA 90740
Telephone: (949) 551-9000
(Lead Attorneys for Plaintiffs on Tort Claims)

FREEDOM X

By:   _____/s William J. Becker, Jr._____
WILLIAM J. BECKER, JR., ESQ. (SBN: 134545)
Bill@FreedomXLaw.com
11500 Olympic Blvd., Suite 400
Los Angeles, CA 90064
Telephone: (310) 636-1018
(Lead Attorney for Plaintiffs on Constitutional Claims)

Complaint

Case No. 4:18-cv-0268

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs John Jennings, Katrina Redelsheimer, Trever Hatch and Donald Fletcher demand trial by jury on all individual claims they bring against their attackers in this action of all issues so triable.

SHAWN STEEL LAW FIRM

By: _____ /s Shawn Steele _____
SHAWN STEEL, ESQ. (SBN: 80706)
ShawnSteel@shawnsteel.com
Alexander C. Eisner, Esq. (SBN: 298968)
AlexanderEisner@shawnsteel.com
3010 Old Ranch PKWY, Suite 260
Seal Beach, CA 90740
Telephone: (949) 551-9000
(Lead Attorneys for Plaintiffs on Tort Claims)

FREEDOM X

By: _____ /s William J. Becker, Jr. _____
WILLIAM J. BECKER, JR., ESQ. (SBN: 134545)
Bill@FreedomXLaw.com
11500 Olympic Blvd., Suite 400
Los Angeles, CA 90064
Telephone: (310) 636-1018
(Lead Attorney for Plaintiffs on Constitutional Claims)

Complaint                                                                 Case No. 4:18-cv-0268